ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL (199706)
CARMEN A. MEDICI (248417)
ARTHUR L. SHINGLER III (181719)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
davem@rgrdlaw.com
cmedici@rgrdlaw.com
ashingler@rgrdlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
GEORGE C. AGUILAR (126535)
JENNY L. DIXON (192638)
ERIC M. CARRINO (310765)
5040 Shoreham Place
San Diego, CA  92122
Telephone:  619/525-3990
619/525-3991 (fax)
brobbins@robbinsarroyo.com
gaguilar@robbinsarroyo.com
jdixon@robbinsarroyo.com
ecarrino@robbinsarroyo.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE MANNIS, M.D., TONIANNE FRENCH, M.D., and LOUIS LIM, M.D., Individually and on Behalf of All Others Similarly Situated, ) ) ) ) ) | Case No.  '19CV0341 L    RBB |
| | CLASS ACTION |
| Plaintiffs, ) ) ) | COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND CALIFORNIA BUSINESS & PROFESSIONS CODE §§16700, *et seq*. AND 17200, *et seq*. |
| vs. ) ) | |
| AMERICAN BOARD OF MEDICAL SPECIALTIES, AMERICAN BOARD OF ANESTHESIOLOGY and AMERICAN BOARD OF EMERGENCY MEDICINE, ) ) ) ) ) ) | |
| Defendants. ) ) | DEMAND FOR JURY TRIAL |

Plaintiffs Steve Mannis, M.D., Tonianne French, M.D., and Louis Lim, M.D. ("plaintiffs"), individually and on behalf of all those similarly situated, bring this action for treble damages and injunctive relief against defendants for violations of the Sherman Antitrust Act ("Sherman Act"), California's Cartwright Act ("Cartwright Act") and California's Unfair Competition Law ("UCL").[1]  Based on counsel's investigation, research and review of publicly available documents, on plaintiffs' personal knowledge, and upon information and belief, plaintiffs allege as follows:

## NATURE OF THE ACTION

1.     For years ABMS and its member boards have abused and continue to abuse their dominant position within the American medical community, receiving massive, illegally obtained revenue through anticompetitive means.  Not only has their conduct been at the expense of physicians nationwide, it has sharply curtailed, if not eliminated, fair competition in the field of medical specialty certification maintenance.

2.     In addition to obtaining a license to practice medicine from the states in which they practice and other state-mandated requirements, physicians obtain one or more industry-specific certifications in a particular specialization within the field of medicine.  This is called Initial Board Certification ("board certification" or "IBC").

---

[1]   Defendants include the American Board of Medical Specialties ("ABMS") and the following two certifying medical specialty boards that ABMS encompasses:  the American Board of Anesthesiology ("ABA") and the American Board of Emergency Medicine ("ABEM").  In addition to these two boards, ABMS also consists of 22 more certifying medical specialty boards that are also co-conspirators with defendants. These ABMS member boards include: the American Board of Obstetrics and Gynecology; the American Board of Dermatology; the American Board of Allergy and Immunology; the American Board of Colon and Rectal Surgery; the American Board of Family Medicine (a/k/a American Board of Family Practice); the American Board of Internal Medicine; the American Board of Medical Genetics and Genomics; the American Board of Neurological Surgery; the American Board of Nuclear Medicine; the American Board of Ophthalmology; the American Board of Orthopaedic Surgery; the American Board of Otolaryngology - Head and Neck Surgery; the American Board of Pathology; the American Board of Pediatrics; the American Board of Physical Medicine and Rehabilitation; the American Board of Plastic Surgery; the American Board of Preventive Medicine; the American Board of Psychiatry and Neurology; the American Board of Radiology; the American Board of Surgery; the American Board of Thoracic Surgery; and the American Board of Urology.  ABMS and all of its member boards are collectively referred to herein as "ABMS."

- 1 -

The purpose of IBC is to indicate that, beyond meeting state licensing requirements, a board certified doctor also has demonstrated the skill, knowledge and ability to practice the medical specialty for which he or she is certificated.

3.      Approximately 90% of the over 880,000 licensed physicians in the United States are board certified in at least one medical specialty by ABMS, which, as the dominant seller of IBC, has monopoly power in the IBC market.

4.      Far beyond being simply a voluntary act taken by some doctors to demonstrate a specific medical skill or to distinguish themselves from other doctors, board certification has evolved to become an essential component of a physician's commercial practice.  Indeed, it has become a *de facto* requirement for meaningful participation in the commercial practice of medicine.  Fully licensed doctors authorized to practice medicine cannot expect to maintain a commercial practice, including the core requirements that they be able to maintain hospital admitting privileges and, perhaps more importantly, treat a majority of the commercially insured patients in the United States, without being board certified.  Thus, failure by physicians to maintain their board certification is likely to have devastating effects on their livelihood, income and ability to practice medicine.

5.      In addition to selling IBC, ABMS requires that board-certificated doctors also maintain their IBC by purchasing "maintenance of certification" or "MOC" from ABMS.  Failure to purchase MOC from ABMS results in loss of certification, regardless of a physician's skill or ability within their given specialty.  Indeed, purchasing MOC from a provider other than ABMS results in loss of IBC because ABMS will not recognize any MOC other than that purchased through it.  Given the realities of maintaining a commercial practice of medicine, doctors have no practical choice about maintaining their IBC.

6.      In addition to its monopoly of the market for board certification, ABMS also maintains a monopoly of the market for MOC.  As described herein, ABMS ties the required purchase of MOC with its sale of IBC.  Thus, because IBC is a *de facto*

requirement for maintaining a commercial medical practice, and because the failure of a physician to submit to ABMS's imposition of forced MOC effectively results in loss of IBC, meaningful competition in the MOC market is foreclosed. ABMS further will not accept any MOC other than its own, revoking a physician's IBC where an MOC is not obtained from ABMS, and thus other MOC providers and other potential MOC providers are excluded from the market and its competition.

7. Through their MOC monopoly, defendants abuse their position to extract inflated supracompetitive payments for MOC from certificated physicians and engage in other predatory and anticompetitive activities. Plaintiffs, fair competition and American medical community participants – from physicians to competitor certification providers to consumers – have been injured.

8. Accordingly, plaintiffs, individually and on behalf of a class of those similarly situated, seek damages, injunctive relief, and all other appropriate relief for defendants' wrongdoing.

## JURISDICTION AND VENUE

9. Plaintiffs' claims for injuries sustained by reason of, *inter alia*, defendants' violations of §§1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, are brought pursuant the Clayton Act, 15 U.S.C. §§15 and 26, to obtain damages and injunctive relief and the costs of this suit, including reasonable attorneys' fees.

10. This Court has original federal question jurisdiction over the Sherman Act claims asserted in this Court pursuant to 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

11. Venue is proper in this judicial district pursuant to §12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §1391(b), (c) and (d), because defendants reside, transact business, are found, or have agents in this District, and a substantial part of the events giving rise to plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this

1   District.  Venue is also proper in this District because acts in furtherance of the alleged

2   wrongdoing took place here.

3        12.   Further, defendants operate and transact business within the District,

4   defendants have substantial contacts with this District, and defendants engaged in

5   illegal conduct that was directed at, and had the effect of causing injury to, persons

6   and entities residing, located, or doing business in the District.  ABMS's contacts with

7   the State of California are extensive.  It is estimated that almost one in every eight

8   physicians in the United States resides in California – more than any other U.S. state.

9                           **THE PARTIES**

10       13.   Plaintiff Steve Mannis, M.D. ("Dr. Mannis") was in practice for nearly

11   40 years and is now retired.  Dr. Mannis was certified by the ABEM.  Dr. Mannis's

12   certification lasted between 1987 and 2017.  Dr. Mannis earned his medical degree

13   from Universidad Autonoma de Guadalajara.  He then completed a residency in

14   Emergency Medicine at Toledo Hospital in Ohio.  Dr. Mannis is a resident of

15   California.

16       14.   Plaintiff Tonianne French, M.D. ("Dr. French") has been in practice for

17   more than 20 years.  Dr. French is certified by the ABEM.  Dr. French received her

18   medical degree from Naval School of Health Sciences.  Dr. French completed an

19   internship at Naval Medical Center San Diego with an emphasis in obstetrics and

20   gynecology.  She then completed her residency at Naval Medical Center San Diego

21   with an emphasis in emergency medicine.  Dr. French is a resident of California.

22       15.   Plaintiff Louis Lim, M.D. ("Dr. Lim") has been in practice for more than

23   15 years.  Dr. Lim is certified by the ABA.  Dr. Lim received his medical degree from

24   Loma Linda University School of Medicine.  Dr. Lim completed an internship at

25   Cedars Sinai Medical Center and his residency at Loma Linda University Medical

26   Center.  Dr. Lim is a resident of California.

27       16.   Defendant American Board of Medical Specialties is a nationally

28   recognized non-profit organization that sets the standards for and certifies doctors as

capable in specified medical specialties and subspecialties, as described herein, through its 24 member boards.  ABMS is headquartered in Chicago, Illinois.  ABMS and all of its 24 member boards are collectively referred to herein as "ABMS."

17.    Defendant American Board of Anesthesiology is a non-profit organization that became an ABMS member in 1941.  ABA is headquartered in Raleigh, North Carolina.

18.    Defendant American Board of Emergency Medicine is a non-profit organization that became an ABMS member in 1979.  ABEM is headquartered in East Lansing, Michigan.

### CO-CONSPIRATORS

19.    Each of the following ABMS member boards participated in the violations alleged herein, having conspired with and performed acts and made statements in furtherance thereof.

20.    American Board of Obstetrics and Gynecology ("ABOG") is a non-profit organization that became an ABMS member in 1933.  ABOG is headquartered in Dallas, Texas.

21.    American Board of Dermatology ("ABD") is a non-profit organization that became an ABMS member in 1933.  ABD is headquartered in Newton, Massachusetts.

22.    American Board of Allergy and Immunology ("ABAI") is a non-profit organization that became an ABMS member in 1971.  ABAI is headquartered in Philadelphia, Pennsylvania.

23.    American Board of Colon and Rectal Surgery ("ABCRS") is a non-profit organization that became an ABMS member in 1949.  ABCRS is headquartered in Taylor, Michigan.

24.    American Board of Family Medicine ("ABFM") is a non-profit organization that became an ABMS member in 1969. ABFM is headquartered in Lexington, Kentucky.

25. American Board of Internal Medicine ("ABIM") is a non-profit organization that became an ABMS member in 1936. ABIM is headquartered in Philadelphia, Pennsylvania.

26. American Board of Medical Genetics and Genomics ("ABMGG") is a non-profit organization that became an ABMS member in 1991. ABMGG is headquartered in Rockville, Maryland.

27. American Board of Neurological Surgery ("ABNS") is a non-profit organization that became an ABMS member in 1940. ABNS is headquartered in Rochester, Minnesota.

28. American Board of Nuclear Medicine ("ABNM") is a non-profit organization that became an ABMS member in 1971. ABNM is headquartered in St. Louis, Missouri.

29. American Board of Ophthalmology ("ABO") is a non-profit organization that became an ABMS member in 1933. ABO is headquartered in Doylestown, Pennsylvania.

30. American Board of Orthopaedic Surgery ("ABOS") is a non-profit organization that became an ABMS member in 1935. ABOS is headquartered in Chapel Hill, North Carolina.

31. American Board of Otolaryngology – Head and Neck Surgery ("ABOHNS") is a non-profit organization that became an ABMS member in 1933. ABOHNS is headquartered in Houston, Texas.

32. American Board of Pathology ("ABPATH") is a non-profit organization that became an ABMS member in 1936. ABPATH is headquartered in Tampa, Florida.

33. American Board of Pediatrics ("ABP") is a non-profit organization that became an ABMS member in 1935. ABP is headquartered in Chapel Hill, North Carolina.

34.     American Board of Physical Medicine and Rehabilitation ("ABPMR") is a non-profit organization that became an ABMS member in 1947.  ABPMR is headquartered in Rochester, Minnesota.

35.     American Board of Plastic Surgery ("ABPS") is a non-profit organization that became on ABMS member in 1941.  ABPS is headquartered in Philadelphia, Pennsylvania.

36.     Defendant American Board of Preventive Medicine ("ABPM") is a non-profit organization that became ABMS member in 1949.  ABPM is headquartered in Chicago, Illinois.

37.     American Board of Psychiatry and Neurology ("ABPN") is a non-profit organization that became an ABMS member in 1935.  ABPN is headquartered in Deerfield, Illinois.

38.     American Board of Radiology ("ABR") is a non-profit organization that became an ABMS member in 1935.  ABR is headquartered in Tucson, Arizona.

39.     American Board of Surgery ("ABS") is a non-profit organization that became an ABMS member in 1937.  ABS is headquartered in Philadelphia, Pennsylvania.

40.     American Board of Thoracic Surgery ("ABTS") is a non-profit organization that became an ABMS member in 1971.  ABTS is headquartered in Chicago, Illinois.

41.     American Board of Urology ("ABU") is a non-profit organization that became an ABMS member in 1935.  ABU is headquartered in Charlottesville, Virginia.

**FACTUAL ALLEGATIONS**

42.     To practice medicine in the United States, physicians and surgeons are required to have obtained an MD degree, pass the United States Medical Licensing Examination ("USMLE"), and obtain a license granted by their individual state licensing board.  The USMLE uniformly serves the function for all states of assessing

physician readiness and ability to practice medicine (as the USMLE describes it, the "ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care")[2] and "ensur[ing] that all licensed MDs . . . pass[] the same assessment standards – no matter in which school or which country they had trained."[3]

43. In addition, all but five states have a minimum continuing medical education ("CME") requirement for physicians to maintain their licenses "in order to ensure the continuing competence of licensed physicians and surgeons."[4]

44. Alongside state licensing of physicians, board certification is an industry-centric private process whereby physicians can obtain one or more certifications in a particular specialization within the field of medicine from a group of experts in that specialization. For example, in addition to being a licensed physician, a doctor might be certified in internal medicine, medical oncology, geriatric medicine and/or any one of a number of additional specialties and subspecialties. The purpose of IBC is to indicate that, beyond meeting state-mandated licensing requirements, a physician has also demonstrated distinct skills, knowledge and abilities to practice a medical specialty in a particular field of medicine.

---

[2] *What is USMLE?*, USMLE, https://www.usmle.org (last visited Feb. 15, 2019).

[3] *Why One National Examination?*, https://www.usmle.org/about/ (last visited Feb. 15, 2019). The USMLE's purpose is to provide "high-quality assessments across the continuum of physicians' preparation for practice," including "provid[ing] to licensing authorities meaningful information from assessments of physician characteristics – including medical knowledge, skills, values, and attitudes." *USMLE Mission Statement*, USMLE, https://www.usmle.org/about/ (last visited Feb. 15, 2019).

[4] *See, e.g.*, Cal. Bus & Prof. C. §2190; *see also, e.g.,* Title 22 Tex. Admin. Code §166.2 (2019); Oregon Medical Board, Ch. 847, Div. 8, 847-008-0070, Continuing Medical Competency (Education), https://secure.sos.state.or.us/oard/viewSingleRule.action?ruleVrsnRsn=238932 (last visited Feb. 15, 2019).

45.     Currently, approximately 90% of all licensed physicians in the United States – over 880,000 doctors – are board certified in at least one medical specialty.[5] ABMS is the dominant provider of IBC in the United States.

46.     The value of specialty certification initially stems from its information-providing function, something particularly helpful in an industry like healthcare in which consumers may largely have incomplete information concerning doctor quality and skills, as well as its potential pro-competitive effects.  As the U.S. Department of Justice ("DOJ") states, "certification can signal that a practitioner has distinct skills, knowledge, and abilities to practice a specialty that go beyond licensing."[6]  The DOJ continues, explaining:

> That signal can promote specialization, choice, and competition.  For example, a consumer with specialized needs can more efficiently search for providers who have signaled expertise in the relevant specialty.  In turn, a provider may attract more consumers or charge a premium reflecting the value of the specialized service, and that premium may encourage other providers to pursue that specialty and offer services in that narrower market.  Certifications can also signal enhanced quality, perhaps by certifying that a provider has demonstrated a certain level of training, testing, or experience over and above other providers.  That signal can help consumers distinguish among providers for the same service based on the quality of service they expect to receive.  This ability to distinguish may provide higher quality providers an incentive to invest in higher quality care.[7]

47.     However, in the context of IBC, the DOJ has expressed specific competition-related concerns:

---

[5]     *See* Trisha Torrey, *What Is Medical Board Certification?*, verywellhealth.com (Feb. 6, 2018), https://www.verywellhealth.com/what-is-medical-board-certification-2615005 (last visited Feb. 19, 2019); *see also* ABMS News Release, *American Board of Medical Specialties Releases Updated Board Certification Report* (Oct. 3, 2017) ("More than 880,000 physicians are board certified . . . .").  The remaining non-certified but licensed doctors generally engage in research or academia, or treat cash-paying or government insured patients.

[6]     Letter from Robert Potter, Chief Competition Policy & Advocacy Section, U.S. Department of Justice, to Dan K. Morhaim, M.D., Maryland House of Delegates, at 10 (Sept. 10, 2018), https://mhcc.maryland.gov/mhcc/pages/home/workgroups/documents/moc/DOJ_Letter.pdf (last visited Feb. 15, 2019).

[7]     *Id.*

- 9 -

Private certifying bodies . . . can raise competition concerns under certain circumstances. Certifying bodies are frequently governed by active market participants. Because, like other forms of professional standards-setting, certification can become a de facto requirement for meaningful participation in certain markets, a certification requirement may create a barrier to entry. In such circumstances, certification may function more like licensing requirements – establishing who can and cannot participate in a market – rather than voluntary certification that can help patients and others distinguish on quality among a range of providers.[8]

48.    The DOJ continues:

The more certification comes to resemble licensing, the more such industry self-regulation raises similar concerns. For example, as the U.S. Supreme Court has explained, though market participants offer important and needed experience and expertise about their practice and profession, such professionals, when empowered to set licensing requirements without meaningful review, "may blend [ethical motives] with private anticompetitive motives in a way difficult even for market participants to discern." Similarly, competitive concerns can arise when private standard-setting processes become "biased by members with economic interests in restraining competition." The governing members of a dominant certifying body may have incentives to set certification requirements more stringently than is necessary to certify that providers have the relevant knowledge and skills. In situations where one certifying body has become dominant, such that physicians cannot turn to alternative bodies for a similar certifying function, market forces might not constrain the dominant body from acting on these incentives. If requirements artificially constrain the supply of certified providers and raise their costs, certification may limit competition among providers and allow for providers to raise prices paid by payers and consumers. As this letter discusses further below, if competition among bona fide certifying bodies were to develop, that could provide a meaningful check on such incentives. Moreover, even where there is no effective competition among certifying bodies, incentives to raise barriers for physicians to practice medical specialties by setting unnecessarily stringent certification requirements could be circumscribed to the extent a certifying body has procedures in place to ensure that input is available from, and decision-making is vested in, groups that represent a balance among the various relevant stakeholders, including not only doctors, but also, potentially, hospitals, insurers, and patient advocacy groups.[9]

---

[8]    *Id*. at 10-11 (citing, *e.g.*, *ABMS Board of Directors*, Am. Bd. of Med. Specialties (last visited Aug. 29, 2018), https://www.abms.org/about-abms/governance/abms-board-of-directors/ (vast majority of board members are medical doctors); *Board of Directors*, Am. Bd. of Internal Med., https://www.abim.org/about/governance/board-of-directors.aspx (last visited Aug. 29, 2018) (same).

[9]    *Id*. at 11-12 (citing *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1111, 1115 (2015) ("State laws and institutions are sustained by this tradition when they draw upon the expertise and commitment of professionals.");and *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501, 509 (1988) (noting that "private standards can have significant procompetitive advantages" if "procedures . . .

- 10 -

49.     Implicating the very concerns raised by the DOJ, ABMS certification has become a foundational component of the practice of medicine in the United States.  It is so essential, in fact, that a doctor who is fully licensed by their state and authorized by law to practice medicine but who is not also a board certified physician in their given specialty cannot expect to maintain a commercial practice, including maintaining hospital admission privileges, and, most significantly, treat a majority of the roughly 217 million commercially insured U.S. residents.[10]

50.     ABMS is well aware of these requirements, acknowledging that:

> Hospitals and health care groups . . . use a credentialing process that involves checking a physician's Board Certification, education, training, experience, and other background information before granting practice privileges.  Insurance companies, law firms, recruiters, and research organizations also regularly check Board Certification status for their particular purposes.[11]

51.     Insurance companies place significant weight on, if not requiring or effectively requiring, board certification.  By way of example, as relevant here, in order to be considered for becoming an Anthem-credentialed healthcare provider, doctors are required to "have current, in force board certification (as defined by the American Board of Medical Specialties ('ABMS') . . .) in the clinical discipline for which they are applying." [12]  ABMS certification is also a central consideration of

---

prevent the standard-setting process from being biased by members with economic interests in stifling product competition")).

[10]   *See* Edward R. Berchick, *et al.*, *Health Insurance Coverage in the United States: 2017*, U.S. Census Bureau, at 4, Table 1 (Sept. 2018), https://www.census.gov/content/dam/Census/library/publications/2018/demo/p60-264.pdf (last visited Feb. 19, 2019).

[11]   *Verify Certification*, ABMS, https://www.abms.org/verify-certification (last visited Feb. 15, 2019).

[12]   *Anthem Provider Administration – Credentialing and Maintenance*, Anthem Blue Cross and Blue Shield – Provider Manual (July 2016), https://www11.anthem.com/provider/noapplication/f0/s0/t0/pw_b154811.pdf?refer=ahpprovider (last visited Feb. 15, 2019).

- 11 -

1  being credentialed for Aetna's doctor network.[13]  Cigna, likewise, requires board

2  certification for application to its Medical Network Credentialing.[14]

3       52.     The dominant entity providing specialty IBC to doctors in the United

4  States is ABMS.  ABMS was originally established in 1933 by a small organization of

5  medical specialty boards and groups of physicians and medical educators.  Its purpose

6  was to develop "a national system of standards for recognizing specialists and

7  providing information to the public."[15]  ABMS developed and oversees a uniform

8  system for the administration of examinations designed to assess physician education,

9  knowledge, experience and skill in given medical specialties.

10      53.     In the years since its inception, ABMS has grown in the number of

11 specialties for which it provides certification, as additional specialty boards were

12 added to ABMS.  All but six of the ABMS member boards joined ABMS by 1949.[16]

13 Five member boards joined in the ten years between 1969 and 1979.[17]  The final

14

15

_____

16 [13]  *Medical Credentialing, What does the Aetna doctor credentialing process involve?*, Aetna, http://www.aetna.com/docfind/cms/assets/pdf/MedicalCredentialing.pdf (last
17 visited Feb. 19, 2019).

18 [14]  *Cigna Medical Network Credentialing*, Cigna, https://www.cigna.com/health-care-providers/credentialing/join-medical-network (last visited Feb. 19, 2019).

19 [15]  *ABMS History of Improving Quality Care*, ABMS, https://www.abms.org/about-
20 abms/history (last visited Feb. 15, 2019).

21 [16]  American Board of Dermatology (1933), American Board of Obstetrics and Gynecology (1933), American Board of Ophthalmology (1933), American Board of
22 Otolaryngology – Head and Neck Surgery (1933), American Board of Orthopaedic Surgery (1935), American Board of Pediatrics (1935), American Board of Psychiatry
23 and Neurology (1935), American Board of Radiology (1935), American Board of Urology (1935), American Board of Internal Medicine (1936), American Board of
24 Pathology (1936), American Board of Surgery (1937), American Board of Neurological Surgery (1940), American Board of Anesthesiology (1941), American
25 Board of Plastic Surgery (1941), American Board of Physical Medicine and Rehabilitation (1947), American Board of Colon and Rectal Surgery (1949), and
26 American Board of Preventive Medicine (1949).

27 [17]  American Board of Family Medicine (1969), American Board of Allergy and Immunology (1971), American Board of Nuclear Medicine (1971), American Board
28 of Thoracic Surgery (1971), and American Board of Emergency Medicine (1979).

1   member board joined in 1991.[18]  Thus, for the majority of the twentieth century and, at

2   least, for almost thirty years, ABMS has maintained a monopoly as the provider of

3   medical specialty IBC in the United States.  Today, ABMS certifies physicians in 39

4   specialties and 86 subspecialties.[19]

5       54.   ABMS's initial certification occurs after a physician completes residency

6   training and generally requires that physicians complete four years of college or

7   university premedical education, earn a medical degree from an ABMS-approved

8   medical school, complete a three to seven-year ABMS-approved residency, provide

9   attestation letters from the director and/or faculty of their residency program, and

10  become licensed to practice medicine in their state.  ABMS also requires that IBC

11  candidates pass an ABMS exam for the specialty for which the physician seeks

12  certification.  Similarly, physicians seeking subspecialty certification must also

13  complete ABMS-approved additional training during or after their residency, as well

14  as successfully complete additional subspecialty-specific knowledge and clinical

15  judgment assessments.

16      55.   Historically, receiving ABMS certification was sufficient for board

17  certification for the remainder of a physician's career.  By the 1990s, certain ABMS

18  member boards had begun to issue certifications for new applicants that required

19  retesting after 10 years in order to maintain their certification.  Physicians with

20  lifetime certifications, however, were exempt from these requirements.

21      56.   By the early 2000s, ABMS required all of its member boards to

22  uniformly agree that, with the exception of lifetime certificate holders, certification

23  would only be granted to physicians for limited time periods followed by mandatory

24  retesting in order to maintain certification.  In the years since then, the requirements

25

26  _____

[18]   American Board of Medical Genetics and Genomics (1991).

27  [19]   *ABMS Guide to Medical Specialties*, ABMS (2018), https://www.abms.org/
    media/176512/abms-guide-to-medical-specialties-2018.pdf (last visited Feb. 19,
28  2019).

- 13 -

1  for maintaining IBC have increased.  As discussed above, failure to maintain

2  certification is devastating to a physician's ability to treat the vast majority of patients

3  in the United States, and certainly would spell destruction for their medical practice.

4  Indeed, the certification renewal requirements "effectively converted the 'voluntary'

5  aspect of board certification to a requirement to maintain hospital privileges and

6  insurance panel participation and profoundly impact[] a physician's ability to earn a

7  living."[20]

8       57.    The ABMS certification renewal requirements became what is called

9  Maintenance of Certification ("MOC").

10      58.    ABMS MOC began in the latter part of the twentieth century as a

11 voluntary retesting.  Very few physicians participated.  In or around 2005, however,

12 ABMS added more requirements to MOC for re-certification.  MOC then required a

13 minimum number of "'MOC points'" accumulated via "performance improvement

14 projects and data collection exercises" as a prerequisite to the re-examination of

15 physicians.[21]  In the years that followed, ABMS and the member boards expanded the

16 number of required MOC points over shorter time periods.  Moreover, failure to

17 comply with defendants' MOC requirements would be publicly labeled as "'not

18 meeting MOC requirements'" and would result in IBC revocation if not ultimately

19 complied with.[22]

20 _____

21 [20]  Westby G. Fisher & Edward J. Schloss, *Medical specialty certification in the United States – a false idol?*, 47 J. of Interventional Cardiac Electrophysiology 37

22 (2016), https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC5045479/ (last visited Feb. 15, 2019).  These renewal requirements also have been described as the "watershed

23 moment [that] forever changed the landscape of specialty certification from one that primarily served the needs of practicing physicians to one that threatened 'uncertain

24 consequences' and mandated additional requirements designed in large part to serve the ethical views and ongoing financial needs of the Specialty Boards." *Id*.

25 [21]  *Id*.

26 [22]  *Id*.  Significantly, "[t]hese new re-certification mandates were conceived or overseen by ABMS-imposed leadership officers of whom only 9% collectively had

27 recertified in general medicine and 25% had recertified in any certified subspecialty." *Id*.

28

- 14 -

59.     The cost of ABMS MOC requirements to maintain physician certification has grown exponentially.  For example, "[t]he cost of participating in MOC in general medicine mushroomed 244 % (or 16.3% per year) from $795 in 2000 to $1940 in 2014.  Similarly, the cost for subspecialty re-certification grew 257% (or 17.2% per year) over the same time period.  A recent cost analysis estimated general internists incur an average cost of $23,607 (95% CI $5380 to $66,383) and cardiac electrophysiologists incur an average cost of $52,196 (95% CI $9773 to $115,916) in total MOC costs over 10 years."[23]  These costs and fees are unchecked by any meaningful competition due to defendants' anticompetitive conduct.

60.     ABMS MOC is not the same as state-mandated CME requirements, under which physicians are required by their licensing states to accumulate a minimum number of CME credits regularly over a number of years as part of maintaining their license to practice medicine.  CME is a valuable part of continuing physician knowledge that enhances a physician's practice.  MOC is a separate set of requirements imposed, not by the states, but by defendants on physicians in order for physicians to maintain their certifications.

61.     In the context of CME, ABMS MOC has been described as "add[ing] little more than an additional burden to physicians' time and finances."[24]  Research indicates no credible evidence that the ABMS program has led to patient outcome improvements since the MOC requirements' inception.[25]  Indeed, in relation to those

---

[23]  *Id.*

[24]  *Id.*  MOC is distinct in this regard from initial certification, which is unchallenged by plaintiffs.

[25]  *Id.*; *see also* P.N. Fiorilli, *et al.*, *Association of Interventional Cardiology Board Certification and In-Hospital Outcomes of Patients Undergoing Percutaneous Coronary Interventions*, 63 J. Am. Coll. Cardiology 2904-2905 (Apr. 1, 2014) (a study that examined the effect of physician certification status, including lapsed certification, on patient outcomes revealed no effect after coronary intervention); T.H. Lee, *Certifying the Good Physician, A Work in Progress*, 312 J. Am. Med. Ass'n 2340-2342 (Dec. 9. 2014) (according to two studies, re-certification and performance or quality measures are not associated).

1   physicians with lifetime certifications who maintain their ABMS specialty

2   certifications without any participation in MOC, research indicates "no differences in

3   outcomes for patients cared for by internists with time-limited or time-unlimited

4   certification for any performance measure."[26]

5       62.   Physicians, as well, express dissatisfaction with defendants' MOC. For

6   example, the following are attributed to "physicians representing various specialties

7   across the U.S.":

8   •   "'Board recertification has almost nothing to do with my daily work as a
        primary care physician. It is an angst-generating exercise in arcane
9       minutiae that robs me of work and family time for little gain or benefit.
        In my opinion, it is academic extortion and a blatant money grab. Unless
10      absolutely forced to because of business reasons, I hope not to recertify a
        third time as it is a painful experience that does not really help me or my
11      patients.'"

12  •   "'After starting the MOC process for family medicine, I realized there
        was no relevance to my current practice of medicine and that it was pure
13      busy work and a waste of my time. Having recertified six times before
        taking the same test that residents fresh out of training were taking, I
14      could not find any reason for the change. The certification board was
        assuming duties left to state licensure boards with a huge overreach grab
15      for power. As I investigated further, the board could not supply me with
        a satisfactory explanation or real science to back up their claims. They
16      were making a voluntary program mandatory with financial gain and
        power on their part as the real reason.'"

17
18  •   "'Board certification used to be a mark of excellence, not a form of
        extortion, revenue generation and busywork. Maintenance of
19      certification, with its practice improvement, patient voice, patient safety,
        and secured high-stakes examination, has no bearing on what happens in
20      the examination room; there is zero impact on the actual care of patients.
        I have to recertify, otherwise I cannot maintain my insurance, hospital, or
21      employment relationships; this is what makes it extortion'"

22  [26]  John H. Hayes et al., *Association Between Physician Time-Unlimited vs Time-*
23  *Limited Internal Medicine Board Certification and Ambulatory Patient Care Quality*,
        312 J. Am. Med. Ass'n 2358 (Dec. 10, 2014). Importantly, there is no reconciling the
24  purported justification by ABMS for mandatory MOC requirements in maintaining
        ABMS certification – "ensur[ing] better patient care through a physician's
25  participation in an ABMS MOC process which continually assesses and helps enhance
        professional medical knowledge, judgment, professionalism, clinical techniques, and
26  communication skills" – with the fact that a significant number of physicians with
        initial board certifications – those with lifetime certifications that pre-date the MOC
27  requirements – are exempt from the costs of MOC compliance, including fees,
        educational curriculum, testing and time costs. *ABMS Overview and FAQs*, ABMS
28  (Jan. 2016), https://www.abms.org/media/93956/abms-moc_overview_6-15.pdf.

- "'Board certification under ABMS is not essential to my practice of family medicine.'"[27]

63. Physicians are not averse to "lifelong learning."[28] As an industry-leading cardiologist has stated in reference to defendant ABIM's MOC:

> We all support lifelong learning, but an excellent alternative to MOC already exists: continuing medical education (CME). Currently, medical licensure for physicians requires an annual minimum of approximately 25 hours of CME, depending on the state. Physicians accept this requirement because they perceive it as having value. Organizations providing recognized CME programs are regulated by the Accreditation Council for Continuing Medical Education, which requires each CME offering to provide an "educational gap analysis," a needs assessment, information about speakers' potential conflicts of interest, and course evaluations, as well as meeting other performance standards. ***CME offerings must compete with one another, and they therefore provide choice***. If physicians do not perceive value in a particular CME offering, they will go elsewhere – a situation in stark contrast with the ABIM monopoly on MOC.[29]

64. The American Medical Association ("AMA") likewise, has not remained silent on the subject. While the AMA "supports physician accountability, life-long learning and self-assessment," in 2014 it adopted a "policy [that] outlines principles that emphasize the need for an evidence-based process that is evaluated regularly to ensure physician needs are being met and activities are relevant to clinical practice":

- MOC should be based on evidence and designed to identify performance gaps and unmet needs, providing direction and guidance for improvement in physician performance and delivery of care.

- The MOC process should be evaluated periodically to measure physician satisfaction, knowledge uptake, and intent to maintain or change practice.

- MOC should be used as a tool for continuous improvement.

---

[27] *Physicians fed up, feel trapped by MOC*, Medical Economics (April 10, 2016), http://www.medicaleconomics.com/medical-economics-blog/physicians-fed-feel-trapped-moc (last visited Feb. 15, 2019).

[28] Paul S. Teirstein, *Boarded to Death – Why Maintenance of Certification is Bad for Doctors and Patients*, 372 New Eng. J. Med. 106, 108 (2015).

[29] *Id*. (emphasis added).

- 17 -

- The MOC program should not be a mandated requirement for licensure, credentialing, payment, network participation or employment.

- Actively practicing physicians should be well-represented on specialty boards developing MOC.

- MOC activities and measurement should be relevant to clinical practice.

- The MOC process should not be cost-prohibitive or present barriers to patient care.[30]

None of these standards is met by the ABMS MOC.

65. Defendants' conduct constitutes an unreasonable restraint of interstate trade and commerce in violation of the Sherman Act and the laws of various states.

66. As a result of defendants' unlawful conduct, plaintiffs and the other members of the Class (as defined herein) have been injured in their business and property in that they have paid more for MOC than they would have paid in a competitive market.

**THE RELEVANT MARKET**

67. For purposes of this action, the relevant geographic market is the United States.

68. Interstate commerce is substantially affected by the conduct challenged herein.

69. The relevant product markets include (i) the IBC market, and (ii) the MOC market. These markets are distinct and not interchangeable, as demonstrated by the fact that ABMS sold IBC long before it started selling MOC and excludes a material number of pre-MOC IBC purchasers from being forced to purchase MOC in order maintain their certification.

70. By ABMS's unlawful conduct challenged herein and the fact that ABMS has and continues to monopolize and maintain the MOC market, including illegal

---

[30] *AMA adopts principles for maintenance of certification*, AMA (Nov. 10, 2014), https://www.ama-assn.org/education/cme/ama-adopts-principles-maintenance-certification (last visited Feb. 15, 2019).

- 18 -

1   tying of IBC with its MOC, ABMS injures competition in the MOC market and

2   collects mandatory supracompetitive MOC fees from certificated physicians. ABMS

3   sells MOC directly to plaintiffs and Class members across the United States. There is

4   no legitimate pro-competitive justification defendants might offer for their illegal

5   course of conduct that is not outweighed by the anticompetitive effects alleged herein.

6           71.     By its monopoly of the IBC and MOC markets, ABMS has, and exerts,

7   the power to exclude competition from the MOC market. Because, as discussed

8   herein, the vast majority of insurers and hospitals in the United States require

9   physicians to have ABMS board certification in order to treat and admit patients,

10   respectively, IBC is necessary for plaintiffs and the Class to meaningfully maintain

11   their commercial medical practices. With the exception of those doctors that ABMS

12   excluded from the required MOC, the failure of a physician to submit to defendants'

13   imposition of forced and excessive MOC results in the inability of that physician to

14   maintain their IBC and, therefore, to meaningfully maintain their commercial practice.

15           72.     The IBC market is and has been controlled by defendants from the mid-

16   twentieth century to the present. Since the inception of MOC, ABMS has similarly

17   controlled the MOC market. Both markets present high entry barriers, not limited to

18   economic and organizational barriers. ABMS stands alone in selling IBC to

19   physicians; no other source of IBC has meaningfully competed with ABMS in this

20   regard. And, as discussed herein, because ABMS leverages its IBC market power to

21   illegally tie its MOC to its IBC, meaningful competition in the MOC market is

22   foreclosed. Indeed, because ABMS will not recognize any competing MOC other

23   than ABMS's MOC in the maintenance of IBC, and because physicians are effectively

24   unable to maintain their commercial practices if they do not purchase MOC from

25   ABMS, ABMS blocks the emergence of any meaningful competition in the MOC

26   market.

27           73.     The anticompetitive effects of ABMS's conduct on competition for MOC

28   is illustrated by the inability of its primary MOC market competitor, the National

Board of Physicians and Surgeons' ("NBPAS"), to gain market share.[31]  NBPAS requires that a physician possess an ABMS IBC, be properly licensed, and complete a set amount of CME in order to obtain MOC from it.  Making NBPAS MOC desirable to physicians, NBPAS offers MOC at significantly lower fees than ABMS and requires less physician time for compliance.  However, despite its national presence and comparable MOC product, because of ABMS's market power, as of September 2018, according to the NBPAS website, no commercial health insurance provider and less than one percent of hospitals accept NBPAS MOC.[32]  ABMS also refuses to accept competitor MOC, revoking physician's IBC where physicians do not obtain ABMS MOC.  Because of the *de facto* requirement that physicians maintain their IBC with ABMS or lose their certification, competitor MOC providers are effectively excluded from competition.

74.    Plaintiffs' and Class members' injuries directly derive from defendants' unlawful conduct.  Defendants' charge increasingly artificially inflated prices for MOC, forcing plaintiffs and the Class to incur and continue to incur at least hundreds of millions of dollars in ABMS MOC fees.  Absent defendants' malfeasance, and in a competitive market, Class members would pay significantly lower, competitive prices for MOC from a source other than or in addition to ABMS.

## CLASS ACTION ALLEGATIONS

75.    Plaintiffs bring this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiffs seek to certify the following Class:

---

[31]  NBPAS does not sell IBC.  It only offers MOC.  This fact also illustrates the distinct nature of the IBC and MOC markets.

[32]  ABMS has not been a passive observer of hospital and commercial payer requirements related to IBC.  To the contrary, ABMS has lobbied directly for and induced these entities and others to require ABMS certification – which includes ABMS MOC, due to defendants' illegal tying conduct – in order to obtain necessary hospital admitting privileges, reimbursement for services from commercial insurance providers, and coverage for malpractice, among other necessary aspects of the Class's medical practices.

1   All persons or entities in the United States and its territories who
2   purchased MOC from defendants to maintain their IBC. The Class
    excludes: (a) defendants, their officers, directors, management,
3   employees, subsidiaries and affiliates; and (b) any judges or justices
    involved in this action and any members of their immediate families.

4   76. Class members are sufficiently numerous and geographically dispersed

5   throughout the United States so that joinder of all Class members is impracticable.

6   77. Plaintiffs are members of the Class, plaintiffs' claims are typical of the

7   claims of the Class members, and plaintiffs will fairly and adequately protect the

8   interests of the Class. Plaintiffs and Class members have been injured by defendants'

9   actions in connection with the unlawful conduct alleged herein. Plaintiffs' interests

10  are coincident with and not antagonistic to those of the other members of the Class.

11  78. Plaintiffs are represented by counsel who are competent and experienced

12  in the prosecution of complex class action litigation.

13  79. The prosecution of separate actions by individual members of the Class

14  would create a risk of inconsistent or varying adjudications, establishing incompatible

15  standards of conduct for defendants.

16  80. The questions of law and fact common to the members of the Class

17  predominate over any questions affecting only individual members, including legal

18  and factual issues relating to liability and damages. Among the questions of law and

19  fact common to the Class are:

20  (a)  Whether defendants violated §1 of the Sherman Act;

21  (b)  Whether defendants violated §2 of the Sherman Act;

22  (c)  Whether defendants violated the Cartwright Act and UCL;

23  (d)  Whether defendants engaged in illegal tying;

24  (e)  Whether the ABMS monopoly in MOC was illegally created and is

25  being illegally maintained;

26  (f)  The duration of the illegal conduct alleged in this complaint;

27  (g)  The nature and character of the acts performed by defendants in

28  violation of the law;

- 21 -

1    (h)    Whether, and to what extent, defendants' conduct caused injury to
2  plaintiffs and members of the Class and the appropriate measure of damages; and

3    (i)    Whether plaintiffs and members of the Class are entitled to
4  injunctive relief to prevent the continuation or furtherance of the violation of the
5  Sherman Act, the Cartwright Act, and the UCL.

6    81.    A class action is superior to other methods for the fair and efficient
7  adjudication of this controversy. Treatment as a class action will permit a large
8  number of similarly situated persons to adjudicate their common claims in a single
9  forum simultaneously, efficiently and without the duplication of effort and expense
10 that numerous individual actions would engender. Class treatment will also permit the
11 adjudication of claims by many Class members who could not individually afford to
12 litigate antitrust claims such as those asserted in this complaint. This class action
13 likely presents no difficulties in management that would preclude its maintenance as a
14 class action. Finally, the Class is readily ascertainable.

## COUNT I

### For Violation of §§1 and 2 of the Sherman Act
### on Behalf of Plaintiffs and the Class

82.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

83.    Defendants conduct alleged herein constitutes illegal tying of the
purchase of MOC to defendants' initial medical specialty certifications, as well as the
creation and maintenance of a monopoly in the MOC market. During the relevant
period, defendants and co-conspirators engaged in a continuing combination or
conspiracy to unreasonably restrain trade and commerce in violation of the Sherman
Act by the conduct alleged herein, artificially reducing or eliminating competition in
the MOC market, and artificially fixing, raising, and/or maintaining the costs of MOC
in the United States. Such conduct constitutes a *per se* violation of the Sherman Act.

84.     Defendants' conduct has anticompetitive effects in the MOC market, and has had and continues to have the effect of artificially inflating the price of purchasing MOC in the United States.

85.     As a direct and proximate result of defendants' unlawful conduct, plaintiffs and the other members of the Class paid more for MOC than they otherwise would have paid in the absence of defendants' unlawful conduct.

86.     By reason of defendants' unlawful conduct, plaintiffs and members of the Class have been deprived of free and open competition in the purchase of MOC.

87.     As a direct and proximate result of defendants' conduct, plaintiffs and members of the Class have been injured and damaged in their business and property in an amount to be determined.

88.     While defendants' conduct as described herein is a *per se* violation of the Sherman Act, it is also unlawful under the rule-of-reason standard, as it an unlawful restraint of trade.  There are no legitimate or pro-competitive justifications for defendants' conduct.  Plaintiffs respectfully submit that the Court should apply well-recognized *per se* rules in order to condemn these challenged trade restraints, but in an abundance of caution plead this claim in the alternative so that it is raised not only under the *per se* rules, but also under the rule-of-reason standard.

89.     Plaintiffs and members of the Class are entitled to damages from and an injunction against defendants, preventing and restraining the violations alleged herein.

## COUNT II

### For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq.*, on Behalf of Plaintiffs and Class

90.     Plaintiffs repeat the allegations set forth above as if fully set forth herein.

91.     Defendants' conduct alleged herein violates the Cartwright Act, Cal. Bus. Prof. Code §16700, *et seq*.

1    92.    Plaintiffs bring this claim on behalf of a nationwide class. Alternatively,

2  plaintiffs bring this claim on behalf of California residents meeting the class

3  definition.

4    93.    Defendants' conduct alleged herein constitutes an illegal conspiracy and

5  combination, including tying the purchase of MOC requirements to defendants' initial

6  medical specialty certifications, as well as the creation and maintenance of a

7  monopoly in the MOC market. Such conduct constitutes a *per se* violation of the

8  Cartwright Act.

9    94.    It is appropriate to bring this action under the Cartwright Act because the

10  plaintiffs reside in California, the plaintiffs conduct their medical practices in

11  California, the plaintiffs purchased their MOC in California, many of the illegal tying

12  arrangements were made and executed in California, and because overt acts in

13  furtherance of the conspiracy and wrongful charges flowing from those acts occurred

14  in California.

15    95.    Defendants' conduct has anticompetitive effects in the MOC market and

16  has had and continues to have the effect of artificially inflating the price of purchasing

17  MOC in California.

18    96.    As a direct and proximate result of defendants' unlawful conduct,

19  plaintiffs and the other members of the Class paid more for MOC than they otherwise

20  would have paid in the absence of defendants' unlawful conduct.

21    97.    By reason of defendants' unlawful conduct, plaintiffs and members of the

22  Class have been deprived of free and open competition in the purchase of MOC.

23    98.    As a direct and proximate result of defendants' conduct, plaintiffs and

24  members of the Class have been injured and damaged in their business and property in

25  an amount to be determined.

26    99.    While defendants' conduct as described herein is a *per se* violation of the

27  Cartwright Act, it is also unlawful under the rule-of-reason standard, as it an unlawful

28  restraint of trade. There is no legitimate or pro-competitive justification for

1  defendants' conduct. Plaintiffs respectfully submit that the Court should apply well-
2  recognized *per se* rules in order to condemn these challenged trade restraints, but in an
3  abundance of caution plead this claim in the alternative so that it is raised not only
4  under the *per se* rules, but also under the rule-of-reason standard.

5  100. Plaintiffs and the Class are entitled to treble damages, attorneys' fees,
6  reasonable expenses, and cost of suit for the violations of the Cartwright Act.

7  **COUNT III**

8  **For Violation of the Unfair Competition Law Under Cal. Bus. &**
   **Prof. Code §17200, *et seq*.,**
9  **on Behalf of Plaintiffs and Class**

10  101. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

11  102. Plaintiffs bring this claim under Cal. Bus. & Prof. Code §§17203 and
12  17204 to enjoin and obtain restitution and disgorgement of all monetary gains that
13  resulted from acts that violated Cal. Bus. & Prof. Code §17200, *et seq*., commonly
14  known as the UCL.

15  103. Plaintiffs and the members of the Class have standing to bring this action
16  under the UCL because they have been harmed and suffered injury in California
17  during the relevant period as a result of the violations of the Sherman Act and the
18  Cartwright Act as alleged herein.

19  104. In formulating and carrying out the alleged agreements and conspiracy,
20  defendants did those things that they combined and conspired to do, including but not
21  limited to, the acts, practices and course of conduct set forth herein, and these acts
22  constitute unfair competition in violation of the UCL.

23  105. Defendants' conspiracy had the following effects, among others:
24  (a) competition in the MOC market in California during the relevant period was
25  restrained, suppressed, and/or eliminated; (b) the cost to plaintiffs and members of the
26  Class for MOC was inflated; and (c) plaintiffs and members of the Class in California
27  during the relevant period have been deprived of the benefits of free and open
28  competition.

106.   As a direct and proximate result of defendants' anticompetitive conduct, plaintiffs and members of the Class have been injured in their business or property by paying inflated and improperly tied MOC as a result of defendants' unfair and noncompetitive acts during the relevant period.

107.   The anticompetitive behavior, as described above, is unfair, unconscionable, unlawful, and fraudulent, and in any event it is a violation of the policy or spirit of the UCL.

**COUNT IV**

**Unjust Enrichment**
**on Behalf of Plaintiffs and the Class**

108.   Plaintiffs repeat the allegations set forth above as if fully set forth herein.

109.   As a result of their unlawful conduct described above, defendants have been and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices for, and unlawful profits on, MOC.

110.   Defendants have benefited from their unlawful acts and it would be inequitable for defendants to be permitted to retain any of the benefits resulting from overpayments made by plaintiffs and the members of the Class for MOC during the Class Period.

111.   Plaintiffs and the member of the Class are entitled to the amount of defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.  Plaintiffs and the members of the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which plaintiffs and the members of the Class may make claims on a *pro rata* basis.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs request that the Court enter judgment on plaintiffs' behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with plaintiffs as the designated Class representatives and their counsel as Class counsel;

B.    Defendants violated §§1 and 2 of the Sherman Act (15 U.S.C. §§1 and 2), the Cartwright Act (Cal. Bus. & Prof. Code §16700, *et seq.*), and the UCL (Cal. Bus. & Prof. Code §17200, *et seq.*), and plaintiffs and the members of the Class have been injured in their business and property as a result of defendants' violations;

C.    Plaintiffs and the members of the Class are entitled to recover damages sustained by them, injunctive relief, and entry of a joint-and-several judgment in favor of plaintiffs and the Class against defendants in an amount to be trebled;

D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the unlawful conduct alleged herein;

E.    Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.    Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.    Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

1

**JURY DEMAND**

2      Plaintiffs demand a trial by jury of all issues triable by jury.

3   DATED:  February 19, 2019              ROBBINS GELLER RUDMAN
                                              & DOWD LLP
4                                          DAVID W. MITCHELL
                                           CARMEN A. MEDICI
5                                          ARTHUR L. SHINGLER III

6

7                                            */s/David W. Mitchell*
                                           DAVID W. MITCHELL

8
                                           655 West Broadway, Suite 1900
9                                          San Diego, CA  92101-8498
                                           Telephone:  619/231-1058
10                                         619/231-7423 (fax)

11                                         ROBBINS ARROYO LLP
                                           BRIAN J. ROBBINS
12                                         GEORGE C. AGUILAR
                                           JENNY L. DIXON
13                                         ERIC M. CARRINO
                                           5040 Shoreham Place
14                                         San Diego, CA  92122
                                           Telephone:  619/525-3990
15                                         619/525-3991 (fax)

16                                         Attorneys for Plaintiffs

17   I:\Admin\CptDraft\Antitrust\Cpt ABMS.docx

18

19

20

21

22

23

24

25

26

27

28

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

STEVE MANNIS, M.D., TONIANNE FRENCH, M.D., and LOUIS LIM, M.D., Individually and on Behalf of All Others Similarly Situated,

**DEFENDANTS**

AMERICAN BOARD OF MEDICAL SPECIALTIES, AMERICAN BOARD OF ANESTHESIOLOGY and AMERICAN BOARD OF EMERGENCY MEDICINE,

**(b)** County of Residence of First Listed Plaintiff   San Diego County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David W. Mitchell, Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101   619/231-1058

Attorneys *(If Known)*

'19CV0341 L    RBB

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability   Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel &   ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☒ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander   Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability   ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 340 Marine | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 345 Marine Product Liability   **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability   ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal   ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | Injury   ☐ 385 Property Damage | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice   Product Liability | Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations   ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment   ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other   **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education   ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§1 and 2
Brief description of cause:
COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE   Robert F. Kelly   DOCKET NUMBER   2:18-cv-05260 (ED Pa.)

DATE   02/19/2019   SIGNATURE OF ATTORNEY OF RECORD   s/ David W. Mitchell

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)  Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)  County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)  Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.  Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.  Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.  Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.  Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.  Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.  Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.